NO ORAL ARGUMENT SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 21-5268
(C.A. No. 16-2443)

MICHELLE A. DONAHUE,                                              Appellant,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,                Appellee.

**BRIEF FOR APPELLEE**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATTHEW M. GRAVES
United States Attorney

BRIAN P. HUDAK
JANE M. LYONS
Assistant United States Attorneys

DOUGLAS C. DREIER*
JOHN MOUSTAKAS
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
Douglas.Dreier@usdoj.gov
(202) 252-2551

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Appellee files this certificate as to parties, rulings, and related cases.

### Parties and *Amici*

Appellant is Michelle Donahue, who was the plaintiff in the District Court. Appellee is the Department of Homeland Security and more specifically one of its components, the Federal Emergency Management Agency, which was named as the defendant in the District Court.  Appellant's opening brief identifies Appellee as the Secretary of Homeland Security in his official capacity, and the Secretary is the procedurally correct defendant and was treated as the sole defendant in the District Court.

There were no *amici* or intervenors in the District Court, and there have been no *amici* or intervenors in this Court to date.

### Rulings Under Review

At issue in this appeal are the Honorable Judge Amit P. Mehta's (a) September 23, 2021 Minute Order that, in pertinent part, granted the Secretary's motion *in limine* to exclude testimony by Robyn Ruffo and Laura Hokenstad regarding their own alleged experiences of retaliation, absent a more concrete proffer by Donahue, and deferred ruling on Donahue's motion *in limine* regarding whether certain witnesses for the Secretary would be excluded pending the receipt of additional

information; (b) September 30, 2021 Order (A:278–80) permitting one of Donahue's witnesses (Ruffo) to testify remotely but disallowing remote trial testimony by two of Donahue's other witnesses (Mary Dyer and Chris Goertz); (c) October 1, 2021 oral rulings permitting the Secretary to call Joshua Fishburne and Brian Dodwell and deferring on whether he would be allowed to call Leigh Hoburg and Megan Curtin, and also allowing Donahue to call Ruffo and Hokenstad to testify regarding their own alleged experiences of retaliation, subject to a narrow restriction precluding testimony as to the state of mind of the relevant decisionmaker (A:288–303); and (d) October 7, 2021 oral rulings permitting the Secretary to call Curtin (A:711–18) and Hoburg (A:859–71). Ultimately, an October 2021 jury trial culminated in a verdict for the Secretary, which is under review. SA:20.

## Related Cases

This case has not previously been before this Court. Undersigned counsel is not currently aware of any pending related cases.

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUES .................................................................. 1

PERTINENT STATUTES, RULES, AND REGULATIONS ..................... 2

COUNTERSTATEMENT OF THE CASE .................................................. 3

    I.  DONAHUE'S CASE TO THE JURY. ............................................. 6

    II.  THE SECRETARY'S CASE TO THE JURY. .............................. 13

SUMMARY OF ARGUMENT ................................................................... 25

STANDARDS OF REVIEW ...................................................................... 27

ARGUMENT ............................................................................................... 28

    I.  THE DISTRICT COURT'S ADMISSION OF DODWELL'S, FISHBURNE'S, CURTIN'S, AND HOBURG'S TESTIMONY WAS WELL WITHIN ITS DISCRETION. ............................................. 28

        A.  The Secretary Had No Duty to Supplement His Initial Disclosures With Respect to the Witnesses Allowed to Testify Because They Were Made Known to Donahue, and the Secretary's Omission Was Harmless. ........................... 31

        B.  Because Hoburg Was a Rebuttal Witness Used Solely for Impeachment, the Secretary Was Not Required to Identify Her in Discovery. ...................... 39

        C.  Donahue Has Not Met Her Burden of Demonstrating That the District Court's Decision to Permit Dodwell, Fishburne, Curtin, or Hoburg to Testify Affected the Outcome of the Case. ................................................... 44

    II.  THE DISTRICT COURT ACTED COMFORTABLY WITHIN ITS DISCRETION BY ALLOWING DONAHUE'S "ME TOO" WITNESSES TO TESTIFY WITH ORDINARY INSTRUCTIONS TO REFRAIN FROM SPECULATING ABOUT OTHER WITNESSES' STATE OF MIND. ........... 47

    III.  THE COURT ACTED COMFORTABLY WITHIN ITS TRIAL MANAGEMENT DISCRETION BY NOT ALLOWING TWO INCONSEQUENTIAL WITNESSES WHO FACED NO NEWLY EMERGENT ISSUES TO TESTIFY REMOTELY BECAUSE DONAHUE BELATEDLY ASKED FOR PERMISSION. ............................................................................. 49

CONCLUSION ........................................................................................... 54

ADDENDUM ............................................................................................. 56

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Ali v. Lambert,*
   No. 20-5084, 2021 WL 3009712 (10th Cir. 2021)  ............................................ 52

*Alsabri v. Obama,*
   684 F.3d 1298 (D.C. Cir. 2012)  ........................................................................ 39

*Anderson v. Grp. Hospitalization, Inc.,*
   820 F.2d 465 (D.C. Cir. 1987)  ................................................................... 35, 38

*Chadwick v. Bank of Am., N.A.,*
   616 F. App'x 944 (11th Cir. 2015) (per curiam) ............................................. 29

*Chiasson v. Zapata Gulf Marine Corp.,*
   988 F.2d 513 (1st Cir. 1993)  .................................................................... 40, 41

*Coy v. Iowa,*
   487 U.S. 1012 (1988)  ......................................................................................... 50

*DeBlasio v. Ill. Cent. R.R.,*
   52 F.3d 678 (7th Cir. 1995)  ..................................................................... 39, 40

*Eller v. Trans Union, LLC,*
   739 F.3d 467 (10th Cir. 2013)  .......................................................................... 51

*Grant v. Ent. Cruises & Spirit Cruises, LLC,*
   767 F. App'x 15 (D.C. Cir. 2019) (per curiam) ............................................... 30

*Halbasch v. Med-Data, Inc.,*
   192 F.R.D. 641 (D. Or. 2000)  .......................................................................... 43

*Hayes v. Cha,*
   338 F. Supp. 2d 470 (D.N.J. 2004)  .................................................................. 43

*Heller v. District of Columbia,*
   801 F.3d 264 (D.C. Cir. 2015)  ......................................................................... 32

*Hester v. BIC Corp.,*
   225 F.3d 178 (2d Cir. 2000)  ............................................................................. 48

*Howe v. City of Akron,*
   801 F.3d 718 (6th Cir. 2015)  ........................................................................... 30

\*   *Huthnance v. District of Columbia*,
    722 F.3d 371 (D.C. Cir. 2013) ............................ 27, 28, 35, 37, 44, 45, 52, 54

\*   *Kapche v. Holder*,
    677 F.3d 454 (D.C. Cir. 2012) .................................. 31, 32, 35, 37, 39

    *Lane v. District of Columbia*,
    887 F.3d 480 (D.C. Cir. 2018) ....................................... 35, 46

    *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*,
    327 F.3d 771 (8th Cir. 2003) ........................................ 52-53

    *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*,
    493 F.3d 160 (D.C. Cir. 2007) ........................................... 32

    *Page v. Commandant, U.S. Disciplinary Barracks*,
    844 F. App'x 78 (10th Cir. 2021) ...................................... 48

    *Palmer v. Valdez*,
    560 F.3d 965 (9th Cir. 2009) .......................................... 51

    *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
    57 F.4th 1067 (D.C. Cir. 2023) ........................................ 34

    *Peterson v. Willie*,
    81 F.3d 1033 (11th Cir. 1996) ......................................... 53

    *Sprint/United Mgmt. Co. v. Mendelsohn*,
    552 U.S. 379 (2008) ................................................. 7, 8

    *Standley v. Edmonds-Leach*,
    783 F.3d 1276 (D.C. Cir. 2015) .................................... 39, 43

    *Trout v. Sec'y of Navy*,
    540 F.3d 442 (D.C. Cir. 2008) ......................................... 47

    *United States v. Carver*,
    907 F.3d 1199 (9th Cir. 2018) ......................................... 50

    *United States v. Edwards*,
    388 F.3d 896 (D.C. Cir. 2004) ......................................... 34

    *United States v. Fench*,
    470 F.2d 1234 (D.C. Cir. 1972) ........................................ 39

*United States v. Hampton*,
    718 F.3d 978 (D.C. Cir. 2013) ........................................................ 48

*United States v. Heldt*,
    668 F.2d 1238 (D.C. Cir. 1981) ..................................................... 48

*United States v. Kivanc*,
    714 F.3d 782 (4th Cir. 2013) ......................................................... 51

*United States v. Licavoli*,
    604 F.2d 613 (9th Cir. 1979) ......................................................... 46

*United States v. McMichael*,
    492 F. Supp. 205 (D. Colo. 1980) ................................................. 48

*United States v. Miller*,
    738 F.3d 361 (D.C. Cir. 2013) ....................................................... 46

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ......................................................... 48

*United States v. Robinson*,
    439 F.3d 777 (8th Cir. 2006) ......................................................... 49

*United States v. Williams*
    827 F.3d 1134 (D.C. Cir. 2016) ..................................................... 48

*United States v. Williams*,
    865 F.3d 1328 (11th Cir. 2017) ..................................................... 46

**Statutes**

28 U.S.C. § 1291 ........................................................................... 1, 4

42 U.S.C. § 2000e-16 ....................................................................... 1

**Rules**

Fed. R. Civ. P. 1 ............................................................................ 30

\* Fed. R. Civ. P. 26 ............ 28, 29, 30, 31, 32, 33, 35, 36, 39, 41, 43, 44, 56, 57, 58

Fed. R. Civ. P. 32 ......................................................................... 57

Fed. R. Civ. P. 34 ......................................................................... 56

\* Fed. R. Civ. P. 37 ............................................................... 30, 32, 58

\* Fed. R. Civ. P. 43 ........................................................................ 50, 51, 58

Fed. R. Evid. 402 ........................................................................ 57

Fed. R. Evid. 403 ........................................................................ 34, 53, 57

Fed. R. Evid. 701 ........................................................................48, 59

Fed. R. Evid. 702 ........................................................................ 59

**Regulatory Materials**

Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020) ............................. 12

# GLOSSARY

| | |
|---|---|
| A:[#] | Appellant's Appendix Page Number |
| Aplt. Br. | Brief for the Appellant |
| EEO | Equal Employment Opportunity |
| FEMA | Federal Emergency Management Agency |
| Rule(s) | Federal Rule(s) of Civil Procedure |
| SA:[#] | Appellee's Supplemental Appendix Page Number |
| Secretary | Appellee |

## STATEMENT OF JURISDICTION

The District Court had jurisdiction pursuant to 42 U.S.C. § 2000e-16.  On October 12, 2021, a jury returned a verdict in favor of the Secretary, SA:20–21, and on November 28, 2021, Donahue timely noticed an appeal.  A:7.

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether the District Court acted within its discretion when it excluded nine defense witnesses who were not identified on the Secretary's initial disclosures but allowed the Secretary to call four other witnesses likewise omitted but known by Donahue through her employment and on documents used in the case.

II.      Whether the District Court acted within its discretion when it permitted Donahue to call two "me too" witnesses subject to an ordinary, narrow restriction barring testimony regarding the decisionmaker's state of mind, a restriction which Donahue's witnesses violated at trial, arguably mooting or at least rendering any supposed error harmless.

III.      Whether the District Court acted within its trial management discretion when it declined to allow two witnesses to testify remotely when Donahue acknowledged these witnesses were not critical fact witnesses, did not request leave for remote testimony from two different locations until two days before the start of trial, and provided reasons that were not newly emergent.

## __PERTINENT STATUTES, RULES, AND REGULATIONS__

The relevant provisions are set forth in the addendum.

## COUNTERSTATEMENT OF THE CASE

Donahue is a former FEMA employee, who initially brought a four-count complaint asserting claims of sex discrimination, hostile work environment, disability discrimination, and retaliation. A:15–17. Donahue initially challenged a bevy of actions. *See* A:11–15 (enumerating nineteen actions that formed the basis for her first EEO complaint and thirty-two actions that formed the basis for her second EEO complaint). The District Court granted in part and denied in part the Secretary's motion to dismiss, A:1, and after discovery, the District Court granted in part and denied in part the Secretary's motion for summary judgment, A:3. None of those rulings disposing of claims before trial are at issue in this appeal. *See generally* Aplt. Br.

The two claims ultimately tried before a jury were for retaliation and retaliatory hostile work environment. A:611. The parties did not dispute whether Donahue had engaged in prior protected activity or was subjected to adverse action. A:612; A:901–02. The key protected activity that Donahue relied on was, on or about March 5, 2010, she informed FEMA's Office of Equal Rights that one of her subordinates, Robyn Ruffo, had heard an offensive comment from a contractor, Joshua Fishburne. *See* A:28–29. More specifically, Fishburne, who worked with Donahue, Ruffo, and Laura Hokenstad, verbally expressed frustration that Donahue and the others were not listening to him because of his gender. A:681–82. He ended

up having a "sidebar conversation" with Ruffo at a bar where he said: "Because I have a penis, I'm not being listened to." A:679–80. Fishburne's crudeness offended Ruffo, and Donahue (who did not have firsthand knowledge of the incident, but rather heard of the incident later from Ruffo) professed that, by saying those words, Fishburne had sexually harassed Ruffo. A:27.

Donahue's opening brief refers to Fishburne's comment as "the sexual harassment allegations" or the "alleged sexual harassment," Aplt. Br. at 9, 19, and the Secretary's brief refers to this comment as the Fishburne incident. Right after the Fishburne incident, Donahue improperly bypassed the appropriate agency individuals and violated procedures by going directly to the contractor and having Fishburne removed from the contract. A:481–82. On March 5, 2010, Donahue emailed a summary of the Fishburne incident to FEMA's EEO intake manager on Ruffo's behalf, although Ruffo did not file an EEO complaint herself. A:28–29.

On June 19, 2010, Donahue received a written reprimand. A:30. The primary basis for the reprimand was that Donahue had gone outside the chain of command to have Fishburne removed. *See id.* ("Your action was improper, as you were not the Contracting Officer's Technical Representative for that contract, and your actions in contacting the contractor, which resulted in Mr. Fishburne's removal from that tasking, were outside the scope of your authority."). After the reprimand, Donahue's managers placed her on performance improvement plans (in December

2010 and September 2011), placed her on a leave restriction (in December 2010), suspended her twice (in February 2011 and December 2011 to January 2012), and proposed removing her from employment at FEMA (on March 29, 2012), to which Donahue responded by resigning on April 23, 2012, which she considers a constructive discharge.  A:819; *see also* A:11–15.  In the interim, Donahue filed two separate EEO complaints on July 1, 2010, and March 16, 2011.  A:10–13.

The question for the jury was causation.  A:902.  Donahue needed to convince a jury that any of the adverse employment actions taken against her were the result of her prior protected activity.  The key decisionmaker was Dr. Keith Holtermann (the Director of the FEMA division in which Donahue worked), although Donahue alleged that her first-level supervisor Rebecca Siceloff, second-level supervisor Kristen Wyckoff, and Acting Human Resources Director Katina Whitehead also took retaliatory adverse actions against her.  *See* Aplt. Br. at 2.

On October 12, 2021, the jury found in favor of the Secretary.  SA:20.  At issue in this appeal are the District Court's decisions regarding certain witnesses: (1) who were permitted to testify at trial (the Secretary's witnesses: Brian Dodwell, Joshua Fishburne, Megan Curtin, and Leigh Hoburg); (2) who were subject to a narrowing restriction on their testimony that was intended to (but did not) prevent them from speculating as to the decisionmaker's state of mind (Donahue's

witnesses: Laura Hokenstad and Robyn Ruffo); and (3) who were prohibited from being called remotely (Donahue's witnesses: Mary Dyer and Chris Goertz).

## I.    DONAHUE'S CASE TO THE JURY.

During the trial, Donahue called nine witnesses in her case in chief.  First, she called John Aucott.  SA:22–61.  Aucott was a former coworker who worked in FEMA's National Exercise Division with Donahue.  SA:22.  Aucott testified favorably as to Donahue's reputation, described Donahue's relationship with Holtermann, and defended Donahue's actions regarding Fishburne.  SA:23, SA:26–27.

Second, she called Thomas Strother.  SA:62–77.  Strother was also a former coworker who worked in FEMA's National Exercise Division with Donahue. SA:64.  Strother testified favorably as to Donahue's reputation and described his perception that Donahue's relationship with Holtermann soured over the course of Donahue's employment.  SA:65–67.  Strother acknowledged that he did not know why the relationship had soured.  SA:66.

Third, Donahue called Michael Dawson.  SA:79–89.  Dawson worked at FEMA in a different group than Donahue.  SA:80–82.  Dawson testified briefly as to a reduction in Donahue's supervisory duties after the Fishburne incident.  SA:83.

Fourth, she called Katherine Donahue, SA:90–105, who is one of Donahue's adult daughters.  SA:91.  She testified as to her mother's experiences working at

FEMA, including her mother's swift action to remove Fishburne and the changes to her mother's mood and mental health after she engaged in that activity.  SA:94–98.

Fifth, Donahue called Laura Hokenstad.  SA:106–98.  Over the Secretary's objection, the District Court permitted Hokenstad and Donahue's seventh trial witness, Robyn Ruffo, to provide what is colloquially called "me too" testimony. A:300–03 (applying *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008)). The District Court allowed Hokenstad and Ruffo to testify because the alleged retaliation that they suffered involved the "same supervisor, same period of time, and each of them believe that the retaliation arose out of this episode involving Mr. Fishburne . . . and Ms. Donahue's report of the harassment that took place."  A:303. Because the witnesses' affidavits had included improper speculation, *see, e.g.*, A:1188 ("[I]t has been apparent to many that Mr. Fishburne has developed personal relationship with leadership within the [agency] that may have biased Mr. Holtermann's assessment of the situation."), the District Court limited Hokenstad's and Ruffo's testimony to prevent them from improperly speculating on the witness stand.  *See* A:301 ("And so I'm not going to permit them to start speculating about Dr. Holtermann's state of mind or why he did something.  They can testify about what he did and when it happened.  They can't speculate about why Dr. Holtermann or somebody else may have taken actions against Ms. Donahue; for example, there's some of that in those affidavits.").  The District Court asked Donahue's counsel to

be mindful that she was not eliciting that kind of speculative testimony, and counsel responded with "[o]kay."  A:302.

With Donahue thus permitted to introduce appropriate testimony, she called Hokenstad to the stand.  SA:106–98.  Hokenstad testified about working at FEMA and, for a time, reporting to Donahue.  SA:109–10.  Hokenstad testified as to her favorable opinion of Donahue and Donahue's reputation.  SA:111–12.  Hokenstad testified as to Donahue's interactions with Holtermann and her belief that Donahue's and Holtermann's relationship deteriorated after Donahue "filed an EEO claim on behalf of Robyn [Ruffo]."  SA:116.

More specifically, Hokenstad described various adverse actions Holtermann took against Donahue, Ruffo, and Hokenstad.  SA:131, SA:137–38.  Hokenstad testified that Holtermann "took away [Hokenstad's] and Robyn Ruffo's duties" shortly after the Fishburne incident.  SA:143–44.  When Donahue's counsel asked Hokenstad why she "think[s] these things were happening," the District Court held a bench conference and reiterated that Donahue's "me too" witnesses "cannot speculate about Dr. Holtermann's state of mind."  SA:146.  The District Court explained that "if you want to know why something was done to her, you can ask her, did you get any explanation from Dr. Holtermann about why this happened to you, the answer is either yes or no.  If she says, yes, he gave me an explanation, then you can ask her, well, what did he tell you, right?"  *Id.*  Donahue's counsel responded

with "[o]kay[;] [t]hank you," and proceeded "to streamline [her] questions" consistent with the District Court's instruction.  SA:147.  Hokenstad was asked these questions and testified that, shortly after Hokenstad "contacted the EEO," Holtermann "gave me an unsatisfactory annual evaluation, and he used all kinds of subjective language like, I wasn't easy to get along with, you know, I didn't have the right work ethic, which was, by the way, never my experience with other employment," and that "those were the reasons, basically, that he said those were the reasons he terminated me."  SA:148–49.  She proceeded to describe the alleged retaliation she suffered from Holtermann in detail.  SA:149–51.

Sixth, Donahue called Kelly Donahue, who is her other adult daughter. SA:198–205.  The witness described the changes in her mother's mood and health during the relevant time.  SA:202–05.

Seventh, Donahue called Robyn Ruffo, who testified remotely.  SA:206–38; SA:329–74.  Over the Secretary's objection, the District Court permitted Ruffo to testify remotely because "her health circumstances and her particular vulnerability to the severe consequences of potential COVID-19 infection prevent[ed] her from testifying live."  A:278.  (Ruffo testified on direct examination that she was taking "medication that causes confusion and memory loss."  SA:211.)  As indicated above, the District Court permitted Ruffo to testify as to the retaliation that Ruffo

9

purportedly experienced, subject to the same narrow restriction applicable to Hokenstad. *See supra* at 7–8.

Like Hokenstad, Ruffo reported to Donahue.  SA:212.  Ruffo testified favorably as to her opinions of Donahue.  SA:212–13.  Ruffo testified about Donahue's relationship with Holtermann and her perceived change in their relationship. SA:218, SA:228.  Ruffo testified in detail about the Fishburne incident, SA:219–24, and its aftermath, SA:224–28.  Donahue's counsel asked the same types of questions that the District Court advised her that she could ask during Hokenstad's testimony.    Without objection, she asked these questions both with respect to Holtermann's treatment of Donahue, *see, e.g.*, SA:229 ("Do you feel that [Donahue] was treated differently after she went to the EEO office?"); *id.* ("And how was she treated differently?"); SA:231 ("[Y]ou stated that [Holtermann] retaliated against [Donahue], and you gave some examples.  Did . . . the benefits of her employment change after she brought your sex harassment allegations to light?"); SA:235 (asking "why you believed [Holtermann] was building a case against Michelle Donahue"), and also with respect to Holtermann's treatment of Ruffo, *see, e.g.*, SA:232 ("After you raised the sex harassment allegations, did Dr. Holtermann treat you differently than he treated you before?").  Despite the District Court's prior ruling, Ruffo was allowed to testify that Holtermann was "really retaliating against me.  And we [i.e., Donahue and Ruffo] talked about it, and it was because she filed an EEO complaint

on my behalf."  SA:218; *see also* SA:231–32 (Q: "Did Dr. Holtermann retaliate against you?"  A: "Yes.").

Eighth, Donahue called herself.  SA:239–328; SA:375–447, SA:459–523. Donahue testified about her perception that she initially enjoyed a positive relationship with Holtermann.  SA:253–58.  Then Donahue described the Fishburne incident and her ensuing actions.  SA:259–70, SA:274–80.  Next she described how her relationship with Holtermann deteriorated.  SA:270–73, SA:297–304.

During her direct examination, Donahue admitted a document, over the Secretary's objection, in which FEMA attorney Paul Conrad privately emailed Donahue and stated: "[r]emember that I cannot be your personal attorney and YOU HAVE DONE NOTHING WRONG—[HOLTERMANN] HAS NO LEGITIMATE BASIS TO DISCIPLINE YOU."  A:1038 (Exhibit 30); SA:296.  After this communication to Donahue, Conrad emailed Holtermann and told him that "disciplining one of your employees for discussing such contractor related matters involving waste, fraud and abuse of authority with agency legal counsel, the U.S. Office of Special Counsel (OSC) or the [Homeland Security Office of Inspector General] or ordering them to not talk to the [Inspector General], [Office of Special Counsel] or Ethics officials about such matters can be the basis for an U.S. Office of Special Counsel whistleblower retaliation complaint against you and the agency, and could subject yourself to investigation and possible disciplinary action."  A:1040–41

11

(Donahue Exhibit 31). Donahue likewise admitted that document into evidence over the Secretary's objection. SA:296, SA:299. The Secretary had fiercely contested the admissibility of these two documents, A:304–11, but the District Court overruled the objections. SA:296.

Lastly, Donahue called Dr. Anthony Chapman. SA:448–59. Dr. Chapman is a psychiatrist who treated Donahue. SA:449, SA:454. Dr. Chapman testified as to Donahue's mental health. SA:456.

Donahue did not call Mary Dyer or Chris Goertz. Donahue first requested permission to call Dyer and Goertz remotely as "damages witnesses" on September 29, 2021, just two days before trial began and more than a year and a half after COVID-19 was declared to be a national emergency. A:273–74; Aplt. Br. at 6; *see also* Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020). For both witnesses, Donahue provided unsworn statements. A:276 (Dyer); A:277 (Goertz). For both witnesses, Donahue conceded that "[n]either of them are critical fact witnesses." A:274. Dyer stated that she could not testify in person because she has "been a fulltime caretaker for [her] mother in Spokane, Washington since 2013," eight years before the trial. A:276.

Dyer is Donahue's "very good friend" and would have testified as to Donahue's statements to her regarding the purported retaliation she was experiencing and Dyer's observations of Donahue's declining mental health. *Id.*

12

Goertz was Donahue's previous boyfriend, SA:99, and the two "remained friends." A:277. Goertz stated that he could not testify in person because he is "caring for the family property" in Nebraska and is "unable to travel because [he] also care[s] for [his] elderly mother and cannot risk potentially being exposed to COVID-19." *Id.* Like Dyer, Goertz sought to testify as to Donahue's statements to him regarding the purported retaliation she was experiencing and Goertz's observations of Donahue's declining mental health. *Id.*

On September 30, 2021, the District Court declined to permit Dyer or Goertz to testify remotely. A:278–80. The District Court "sympathize[d] with the circumstances of both witnesses," but it refused Donahue's last-minute request for their remote testimony because they did not allege that an accident or illness that they personally were experiencing was the reason they needed to testify remotely and Donahue had "not explained why she has given last-minute notice for their remote testimony," given that "the circumstances both witnesses describe do not appear to be emergent." A:279. With their remote testimony not allowed, Donahue did not have either witness appear at trial.

## II.    THE SECRETARY'S CASE TO THE JURY.

After Donahue rested, the Secretary called eight witnesses in his case in chief. First, he called Dr. Keith Holtermann. A:325–447; A:475–547. Holtermann was the Director of FEMA's National Exercise Division, A:350, which is the division in

13

which Donahue worked, A:354. Holtermann testified that he did not "retaliate against Michelle Donahue or anyone for engaging in protected activities." A:374. He described his interactions with Donahue and Donahue's significant performance and conduct issues. *See, e.g.*, A:375; *see also* A:430–35 (describing an instance in which Donahue was not truthful and concluding that Donahue was "not being truthful on issues of importance to me to carry out my job"); A:437–38 (describing an instance in which Donahue "barg[ed] into a meeting" to which "she was not invited" and conducted herself in a "fairly embarrassing" manner); A:438–43 (describing an instance of Donahue being "insubordinate" by asking three separate times for Holtermann to send her to Texas, where she had property, instead of sending the individual that Holtermann had already informed her he had selected); A:481–82 (explaining that Donahue went outside the chain of command by having Fishburne removed from the contract without going through the proper channels); A:483 (describing a time when Donahue called Holtermann a liar in the presence of his entire staff).

Second, the Secretary called Kristin Wyckoff. A:548–90. Wyckoff served as Donahue's second-level supervisor, with Rebecca Siceloff being Donahue's first-level supervisor. A:559–61. Wyckoff testified that Donahue "really didn't like the idea that at one point in time Becky [Siceloff] had reported to her" and then their supervisory relationship reversed. A:561; A:570 (noting that Donahue said "[d]on't

f\*\*\* with me, Becky"). Wyckoff testified that Donahue "[r]equired a lot of just continual feedback" and made "a lot of requests for information that didn't really seem germane to what she was currently supposed to be working on." A:561. Wyckoff testified about Donahue's poor performance on two performance improvement plans, despite FEMA's offers and efforts to assist her with improvement. A:575.

Third, the Secretary called Brian Dodwell. A:592–606. Donahue objected to Dodwell's testimony because he was not identified on the Secretary's initial disclosures at the start of discovery in the District Court. A:291; *see also* A:48–50 (initial disclosures). The Secretary's initial disclosures were served on February 26, 2018, and named four witnesses as likely to have relevant information: Holtermann, Wyckoff, Siceloff, and Whitehead. A:48–51. Counsel for the Secretary identified these four individuals because they were the four people whom Donahue alleged discriminated against her. *See* Aplt. Br. at 2. The Secretary's initial disclosures also stated that, "[i]n addition to the witnesses and documents identified by Plaintiff in Plaintiff's initial disclosures and discovery responses, Defendant may also utilize additional . . . witnesses testimony which are relevant and which are made known to Defendant during the discovery process or in writing." A:48.

Dodwell was identified by the Secretary on his witness list in the pretrial statement, A:249–50, and on June 17, 2021, the Secretary informed Donahue that he

intended to call Dodwell at trial, Aplt. Br. at 3, a trial which did not commence until October 1, 2021, A:6. The District Court permitted Dodwell to testify because "he is identified multiple times in [Donahue's] own discovery responses" and "in her own deposition" and was also "mentioned multiple times" in Holtermann's deposition. A:293; *see also* A:1046 (Holtermann's deposition transcript identifying Dodwell); A:1115, A:1118–21, A:1134–35, A:1145 (Donahue's discovery responses identifying Dodwell on each page). Donahue thus was not surprised to learn that Dodwell may have relevant testimony. A:293.

The District Court contrasted Dodwell with certain other witnesses whom the Secretary requested to call. *See* A:293–300. The District Court sanctioned the Secretary for not identifying other possible witnesses on his initial disclosures: it excluded any witness who was not sufficiently identified during the discovery process. *See* A:293–94 (explaining that the standard the District Court used was whether the witnesses had "otherwise been made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition"). Specifically, the District Court excluded Catherine Lowenski, Todd McCoy, Rob Schweitzer, Brian McCreary, Bill Webb, Derrick Minor, Page Daggett, Scott Mabe, and Lisa Lofton. A:298–300; Min. Order (Sept. 23, 2021); *see also* A:249–58 (witness proffers).

16

At trial, Dodwell testified that he and Donahue were the two branch chiefs in FEMA's National Exercise Division (which Holtermann ran): Dodwell running its Operations Branch and Donahue running its Policy Branch.   A:593.   Dodwell testified as to his unfavorable opinion of Donahue's professionalism.   A:594. Dodwell described how Donahue went "outside of th[e] chain of command" during discussions regarding a potential detail assignment for Aucott.  A:595–96.  Dodwell described a time when Donahue "disruptive[ly]" entered a meeting "uninvited" and then "somewhat abruptly before the meeting had ended, rose and left the room." A:597–98; *see also* A:598–99 (describing another incident of Donahue behaving inappropriately); A:601–02 (similar).

Fourth, the Secretary called Joshua Fishburne.  A:645–710.  As with Dodwell, Donahue objected to Fishburne's testimony because he was not identified on the Secretary's initial disclosures.  A:288–89.  Fishburne was identified by the Secretary on his witness list in the pretrial statement, A:252, and on June 17, 2021, the Secretary informed Donahue that he intended to call Fishburne at trial, Aplt. Br. at 3. The District Court allowed Fishburne to testify because "[t]here's no question that [Donahue] discussed Fishburne, as he's the alleged harasser that she reported during her deposition testimony."  A:297; *see also* A:1165 (Donahue's deposition transcript identifying Fishburne).

17

Fishburne briefly testified as to his opinions of Donahue, A:666–67, before the District Court sustained Donahue's objection and instructed that Fishburne's testimony on this issue was not relevant, A:668–72. Fishburne primarily testified as to his statement to Ruffo that led to Donahue's protected activity and the ensuing fallout. A:674–98; *see also* A:680 (Fishburne's statement, in describing his sense of having become *persona non grata* on account of his gender: "Because I have a penis, I'm not being listened to."). Fishburne's account of his interaction with Ruffo dramatically contradicted Ruffo's and Donahue's account. *Compare* A:678–86 (Fishburne's version),[1] *with* SA:219–24 (Ruffo's version),[2] *and* SA:397–403 (Donahue's secondhand version). The District Court found that Fishburne's testimony was "fair game" for impeachment because Donahue had made Ruffo's

---

[1] "Ms. Robyn Ruffo knew I was frustrated, she's pretty intuitive at that or I didn't hide it well. And she asked me to come out and have a sidebar conversation in the hallway. . . . And she said, hey, what's going on? I can tell you are frustrated, and, you know, what are you frustrated about? . . . I said, 'Because I have a penis, I'm not being listened to.' And I didn't mean it in a sexual connotation, I meant it as a gender specification. I didn't mean it as something to cause alarm or fear or concern in her. I meant to, like, tell to her plainly, like, this is how it feels, this is – I'm being not heard and I feel like I should be being heard . . . . She asked for a hug, we hugged, hugged it out, and then we both went back into the bar." A:679–86.

[2] "I was going to the bathroom. And there's a big, long hallway. . . . And he grabbed the back of my arm. He says, 'Hey, Robyn.' And I stopped. . . . He said, 'Why didn't you and Laura and Michelle tell me about his new path forward for [the program]?' Something about, you know, 'I was one of the creators of the program,' which, no, he wasn't, 'and is it because I have a penis?' . . . I said — given my military pairing, I said, 'How dare you say that to me? I need to go.'" SA:220–21.

18

contradictory account of the incident part of her case-in-chief. *See* A:713 ("Now, to the extent that you want to argue that Ms. Ruffo is not credible because what she says happened didn't happen because she came in and testified that she was grabbed and she never said that before and you heard from Mr. Fishburne, I guess that's fair game[.]"). Nonetheless, the District Court made clear to the jury that Fishburne is "not a decision-maker here," and "[u]nless he communicated something to someone who's a decision-maker, his views on [Donahue] aren't all that relevant." A:665–66.

Fifth, the Secretary called Megan Curtin. A:740–56. Donahue initially objected to Curtin's testimony because she was not disclosed on the Secretary's initial disclosures. A:717–18. Curtin was identified by the Secretary on his witness list in the pretrial statement, A:254–55, and on June 17, 2021, the Secretary informed Donahue that he intended to call Curtin at trial, Aplt. Br. at 3. The District Court initially reserved ruling on whether the Secretary may call Curtin. A:298. Ultimately, Donahue acknowledged that Curtin "came up in a couple of emails as being copied." A:718. Donahue partially withdrew her objection and conceded that the Secretary could call Curtin if Curtin's testimony was limited to certain issues. *See* A:718 ("We don't have a problem with her talking about how she conveyed the message to Josh Fishburne, because we think that's irrelevant. But if she starts getting into what she thought of Michelle Donahue, we would have a big problem

19

with that.").   The District Court thus allowed Curtin to testify on these narrow grounds.  *Id.*[3]

Curtin, during her testimony, explained that she worked with the same contractor as Fishburne.  A:741.  When asked "what, if anything, did you do in reaction to" learning of the Fishburne incident, Curtin responded that she "could not believe that that was the reason that was being given and that [she] felt horrible about that because Josh [Fishburne] was simply repeating something that [Curtin] had observed and said to him previously."  A:747.  Donahue's counsel did not object to this question, to Curtin's answer, or to several follow-up questions on this point.  A:747–49.  When counsel for the Secretary attempted to ask Curtin for her opinion on Donahue's performance, Donahue's counsel objected, the Court sustained the objection, Curtin did not answer the question, and her direct examination immediately ended.  A:751.

Sixth, the Secretary called Rebecca Siceloff, Donahue's first-level supervisor.  A:757–81, 789–855.  Siceloff testified about times when Donahue inappropriately inserted herself into meetings.  A:770–75.  Siceloff described how, during Siceloff's first formal meeting as Donahue's supervisor, Donahue said: "Don't f*** with me,

---

[3]    When a juror later recognized that the juror knew Curtin in a professional capacity, A:785–87, Donahue confirmed that she had no objection to the juror's continued service, A:788.

Becky. I'm warning you. Don't f*** with me." A:777; *see also* A:779–81 (discussing Donahue's resulting suspension). Siceloff testified that Donahue took an unusually large amount of leave and that she was placed on a leave restriction. A:796–99. Siceloff described Donahue's poor performance on her two performance improvement plans. A:806–08. Siceloff testified that, while Donahue was suspended, Donahue lied to security officers to breach security and be let into the office. A:813–14. Siceloff testified that she proposed to remove Donahue after Donahue failed her second performance improvement plan. A:817–18. Siceloff described the final decision to remove Donahue from employment and explained that Donahue resigned before it became effective. A:818–19.

Seventh, the Secretary called Katina Whitehead. A:927–74, A:979–1003. No longer employed by FEMA, Whitehead previously worked at FEMA in a Human Resources capacity. A:930. Whitehead described the suspensions Donahue received. A:938–60. She discussed Donahue's security breach. A:956–57. She described Donahue's performance improvement plans, A:961–71, and leave restriction, A:979–84. Whitehead discussed Donahue's proposed removal, A:971–73, and Donahue's resignation, A:973–74.

Lastly, the Secretary called Leigh Hoburg. A:1004–14. Donahue initially objected to Hoburg's testimony because the Secretary failed to identify her in his initial disclosures. A:292. Hoburg was identified by the Secretary on his witness

list in the pretrial statement, A:250, and on June 17, 2021, the Secretary informed Donahue that he intended to call Hoburg at trial, Aplt. Br. at 3.  Initially, the District Court ruled that the Secretary could not call Hoburg as a witness.  A:294.

As described above, during Donahue's case-in-chief, Donahue admitted a document in which FEMA attorney Paul Conrad stated that Donahue had "DONE NOTHING WRONG" and that Holtermann "HAS NO LEGITIMATE BASIS TO DISCIPLINE YOU."  A:1038 (Exhibit 30); SA:296, SA:299.  Donahue likewise admitted a follow-up document in which Conrad sent an email warning Holtermann that "disciplining one of your employees for discussing such contractor related matters involving waste, fraud and abuse of authority with agency legal counsel, the U.S. Office of Special Counsel (OSC) or the [Homeland Security Inspector General] or ordering them to not talk to [certain] officials about such matters can be the basis for an U.S. Office of Special Counsel whistleblower retaliation complaint against you and the agency, and could subject yourself to investigation and possible disciplinary action."  A:1040–41 (Donahue Exhibit 31); SA:296, SA:299.  Hoburg was copied on this email, and Conrad's email mentions her as the FEMA employment law attorney with whom Holtermann should speak.  A:1040–41.  Donahue identified Hoburg on direct examination, noting that she "is another attorney at FEMA," which thereby lent further credence to the email.  SA:299.

The Secretary sought to prevent the jury from being misled by Conrad's emails. As the Court noted to counsel, "I don't know how Mr. Conrad could say [whether Holtermann had a legitimate basis to discipline Donahue] one way or another, given that he doesn't seem to have enough information." A:868. The Secretary attempted to have Plaintiff agree to a stipulation that could avoid the need for rebuttal testimony, but the parties did not agree. *Id.* With Conrad unable to testify due to a "serious medical problem," SA:78, the Secretary thus asked to call Hoburg as a rebuttal witness. A:859–71.

Rather than objecting to Hoburg being called as a rebuttal witness, Donahue affirmatively invited it; specifically, Donahue's counsel stated that she "would like the opportunity to question [Hoburg]," and "if the agency wants to go in that direction, we—we would welcome the opportunity to cross-examine her." A:860. In a later colloquy with the Court, Donahue added a narrow caveat to her earlier position, objecting to Hoburg's testimony about "the personnel actions or any of the events in the spring of 2010." A:867. Accordingly, the District Court permitted Hoburg's rebuttal testimony "for a very, very limited purpose"—namely, "to comment about [Donahue's] Exhibit 31" and to "say with respect to [Donahue's] Exhibit 30 whether Mr. Conrad was sort of overstepping his boundaries and his job responsibilities if he was telling Ms. Donahue that she had done nothing wrong" and that Holtermann "has no legitimate basis to discipline [her]." A:868. The District

Court noted that Hoburg's name appeared on Exhibit 31 and that the "email seems to have taken some sizable—or has some significance to [Donahue's] case," and that the prejudice to calling her is minimized because Donahue will have the opportunity to cross-examine her. A:871.

The Secretary thus called Hoburg, with her direct examination covering only ten pages of the transcript. A:1004–13. Hoburg established the very evidence that Conrad's unavailability would have otherwise prevented the Secretary from establishing: that Holtermann was not acting alone and without consultation with Human Resources and Legal, but, in fact, had adopted the very approach that Conrad believed necessary to protect Donahue—namely, that Hoburg was involved and providing advice. Specifically, Hoburg testified that she was involved in preparing Donahue's reprimand, A:1007–08, and she described the structure and proper procedures of her and Conrad's department, A:1008–12. Donahue objected to only one question that the Secretary's counsel asked: "And so are you aware of whether there were several corrective actions or disciplinary actions . . . with respect to Ms. Donahue?" A:1012. Hoburg was permitted to testify that she was aware, A:1012–13, and by that point, the jury had already repeatedly heard about Donahue's suspensions, leave restriction, placements on performance improvement plans, and proposed removal. *See supra*. Donahue conducted a brief cross-examination, A:1013–14, and the Secretary rested without conducting any redirect, A:1014.

24

Donahue did not call any further witnesses. After closing arguments and final instructions, the jury promptly returned a verdict for the Secretary. SA:20–21.

This appeal followed.

## SUMMARY OF ARGUMENT

The judgment below should be affirmed because the District Court conducted a fair trial and managed the proceedings within the procedural rules and with a practical sense of fairness to both parties. The Secretary had no duty to supplement his initial disclosures for the four witnesses at issue on this appeal—i.e., Dodwell, Fishburne, Curtin, and Hoburg—because they were made known to Donahue during the discovery process. The District Court did sanction the Secretary by prohibiting his counsel from calling nine witnesses not at issue here because they were omitted from the initial disclosures and not otherwise made known during discovery. Donahue has not demonstrated that a more severe sanction was warranted under the circumstances because each of these four witnesses allowed to testify at trial was made known to Donahue during the discovery process (and even before that) and the Secretary's failure to name these four individuals in his initial disclosures was harmless. Further, Donahue waived her objections to Curtin and Hoburg during the trial, and the District Court appropriately permitted Hoburg to testify as a rebuttal witness. In addition, Donahue has not met her burden to demonstrate that the

decision to permit these witnesses to testify substantially affected the trial's outcome.

Separately, the District Court's rulings regarding Donahue's "me too" testimony (Hokenstad and Ruffo) were comfortably within its discretion. The District Court allowed Donahue to call these witnesses, and she did call them. The District Court simply prohibited them from speculating as to the decisionmaker's state of mind, which was the ultimate issue for the jury's decision. Donahue waived her objection to the District Court's narrow restriction on their testimony. Donahue did not argue below that this narrow restriction constituted an improper restriction on "lay opinion" testimony, and this argument fails in any event. The jury was in as good a position as the witnesses to draw the inference as to whether or not the decisionmakers were motivated by impermissible animus. Further, Donahue cannot demonstrate that the District Court's narrow restriction substantially affected the trial's outcome because she in fact solicited and received this speculative testimony that the District Court had initially intended to prevent.

Lastly, the District Court acted comfortably within its discretion by prohibiting Donahue from calling two additional damages witnesses (Dyer and Goertz) remotely. Just two days before trial, Donahue requested that two of her friends testify remotely because they both served as caretakers to their respective elderly mothers. At this point, the COVID-19 pandemic had been simmering for

more than a year and a half, and Donahue did not assert that there had been any sort of recent change in the weeks immediately preceding trial that triggered the request very close to the eve of trial.  After the District Court's ruling, Donahue elected not to pursue Dyer's or Goertz's testimony, and she proceeded with her case-in-chief, which included multiple other witnesses on damages, including her psychiatrist. Because the jury ruled in favor of the Secretary, the jury never addressed damages, so the exclusion of two more damages witnesses, whose proposed testimony would otherwise have been cumulative, did not substantially affect the trial's outcome.

Donahue has not met her heavy burden to demonstrate that the District Court abused its discretion.  Accordingly, the Court should affirm the judgment of the District Court.

## STANDARDS OF REVIEW

The Court reviews the district court's evidentiary rulings for abuse of discretion.  *Huthnance v. District of Columbia*, 722 F.3d 371, 377 (D.C. Cir. 2013). The district court plays an "important role" as gatekeeper, which "entails a fair amount of discretion."  *Id.* at 379.  Thus, the Court asks whether the district court has "abandon[ed] its post at the bulwarks of our justice system."  *Id.*

Even if the district court abused its discretion, the Court will "reverse an erroneous evidentiary ruling . . . only if the error affects a party's substantial rights." *Id.* at 377.  This means that, if the district court has abused its discretion, the Court

will reverse only if "the error substantially affected the outcome of the case," with the appellant "bear[ing] the burden of showing prejudice." *Id.* at 381, 383. The Court's analysis "depends on a number of factors, including the closeness of the case, the centrality of the issue in question, and the effectiveness of any steps taken to mitigate the effects of the error." *Id.*

## **ARGUMENT**

### I. THE DISTRICT COURT'S ADMISSION OF DODWELL'S, FISHBURNE'S, CURTIN'S, AND HOBURG'S TESTIMONY WAS WELL WITHIN ITS DISCRETION.

The District Court acted comfortably within its discretion when it admitted the testimony of the four witnesses to whom Donahue objects on appeal, while excluding nine other witnesses whom the Secretary had sought to have testify. In recognition of this Court's highly deferential standard of review for the District Court's evidentiary decisions, Donahue correctly admitted that "exclusion of witnesses is fact specific, case specific, and entirely left to the Judge's discretion." A:181. Donahue now argues on appeal that the District Court abused its discretion. This is incorrect.

Rule 26(a)(1) provides that, subject to certain exceptions, a party must make initial disclosures that include "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims

or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). It also imposes a duty to supplement these initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A); *see also Chadwick v. Bank of Am., N.A.*, 616 F. App'x 944, 948 (11th Cir. 2015) (per curiam) ("[A] party has 'no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition[.]'") (quoting Fed. R. Civ. P. 26(e) advisory committee's note to 1993 amendment).

Additionally, Rule 26(a)(3) provides that a party need not identify the witnesses it intends to call at trial until "at least 30 days before trial" or at any other time that the Court orders for pretrial disclosures. Fed. R. Civ. P. 26(a)(3)(B). At that time, the party must identify "the name and, if not previously provided, the address and telephone number of each witness." Fed. R. Civ. P. 26(a)(3)(A)(i). The interplay between Rule 26(a)(1) and (a)(3) demonstrates that the Rules anticipate the possibility that parties may call individuals who were not previously identified in their initial disclosures. *See id.* ("if not previously provided").

29

Rule 37(c) provides that, if a party fails to identify a witness as required by Rule 26(a)(1) (initial disclosures), (a)(3) (pretrial disclosures), or (e) (supplementation obligations), the party is generally "not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Howe v. City of Akron*, 801 F.3d 718, 750 (6th Cir. 2015) ("conclud[ing] that the Plaintiffs' late disclosure was harmless, and thus the district court's decision to exclude Carr's testimony . . . was an overreaction and an abuse of discretion"). Even if a party's failure is neither substantially justified nor harmless, the sanction of exclusion is not in any sense obligatory: "instead of this sanction," the Court may impose any appropriate sanction, including simply informing the jury of the party's failure. Fed. R. Civ. P. 37(c)(1); *see also Grant v. Ent. Cruises & Spirit Cruises, LLC*, 767 F. App'x 15, 16 (D.C. Cir. 2019) (per curiam) ("The rule gives the trial court broad options for dealing with such failure to disclose."). Here, the Secretary was sanctioned and prevented from calling nine of his intended witnesses. *See* A:299–300. The District Court—based on its familiarity with the entire record and course of proceedings, the arguments presented to it, the issues at trial, and its weighing of options to achieve fairness—did not abuse its discretion by failing to apply a more expansive sanction. *See* Fed. R. Civ. P. 1.

30

**A.    The Secretary Had No Duty to Supplement His Initial Disclosures With Respect to the Witnesses Allowed to Testify Because They Were Made Known to Donahue, and the Secretary's Omission Was <u>Harmless.</u>**

As this Court has previously held, there is no duty to supplement initial disclosures for witnesses who are made known to the other party during the discovery process. *See Kapche v. Holder*, 677 F.3d 454, 468 (D.C. Cir. 2012) ("Although [defendant] did not include Magargle in his initial disclosure, her identity nevertheless became known to [plaintiff] during discovery. . . . Because Magargle's identity was 'made known' to [plaintiff], [defendant] had no obligation to supplement his disclosures pursuant to Rule 26(e)(1)(A) and therefore the district court did not err in allowing Magargle to testify[.]") (quoting Fed. R. Civ. P. 26(e)(1)(A)).  The Court's ruling in *Kapche* is a straightforward application of the Rule's text.  *See* Fed. R. Civ. P. 26(e)(1)(A) (giving rise to a duty to supplement "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing").  The Rules should not be construed to allow a party to block evidence at trial that the party had reason to know of either before (from the party's own knowledge of the events) or during discovery.

For instance, in *Kapche*, the Attorney General did not identify Magargle on his initial disclosures; however, (1) he produced a memorandum to Magargle during discovery, (2) plaintiff asked about Magargle during a deposition and in a discovery request, and (3) the Attorney General identified Magargle in his pretrial disclosures.

31

*Kapche*, 677 F.3d at 468.  It did not matter that Magargle was the decisionmaker who revoked plaintiff's conditional offer of employment,[4] or that the entire Rehabilitation Act case was about the propriety of the revocation of plaintiff's conditional offer.  *Id.* at 458–59, 466.  What mattered was that Magargle was "made known" to plaintiff during discovery, and, therefore, plaintiff's argument that the district court abused its discretion by failing to exclude her from testifying was "meritless."  *Id.* at 468–69.

As *Kapche* reflects, if a witness is made known to a party during discovery and the party would not be surprised to learn that the witness may have discoverable information, then the witness's omission from the initial disclosures is harmless under Rule 37(c)(1).  *See id.*; *see also Heller v. District of Columbia*, 801 F.3d 264, 270 (D.C. Cir. 2015) ("The purpose of the rule is to avoid 'unfair surprise to the opposing party.'") (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007)).  As this Court has previously explained, "[a]dmitting [evidence] that does not cause 'unfair surprise' we deem harmless." *Heller*, 801 F.3d at 270; *see also Muldrow*, 493 F.3d at 167–68 (holding that the alleged Rule 26 violation was harmless because the "testimony could hardly have been an unfair surprise").

---

[4]     In contrast, the Secretary named the decisionmakers in his initial disclosures here.  *See, e.g.*, A:48–50; Aplt. Br. at 2.

Here, each of the four witnesses at issue was made known to Donahue "during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). First, Dodwell was mentioned during Holtermann's deposition, A:1046; *see also* A:1196 (noting that Dodwell is mentioned 26 times in the deposition), during Donahue's deposition, SA:8–15, and in Donahue's discovery responses, A:1115, A:1118–21, A:1134–35, A:1145. Donahue specifically identified Dodwell as someone "having knowledge of sabotage of [Donahue's] supervisor/supervisee relationship." A:1145. Donahue's only argument to the contrary is that *some* documents with Dodwell's name on them may not have been produced in discovery, Aplt. Br. at 20, but Dodwell's name undisputedly appears throughout Donahue's discovery responses, A:1115, 1118–21, A:1134–35, A:1145. Thus, Donahue cannot dispute that Dodwell was made known to her "during the discovery process or in writing," and the fact that he would have discoverable information was not a surprise. Fed. R. Civ. P. 26(e)(1)(A).

Second, Fishburne was likewise made known to Donahue. Fishburne was mentioned during Donahue's deposition, SA:2–7, during Holtermann's deposition, SA:17–19, and in Donahue's discovery responses, A:1117–18, A:1138, A:1147–48.

Donahue does not and cannot contend that Fishburne was unknown to her, and she instead appears to take issue with the relevance of his testimony.[5] Aplt. Br. at 8–10.

The District Court has significant discretion in assessing the relevancy of testimony at trial. *See United States v. Edwards*, 388 F.3d 896, 899–90 (D.C. Cir. 2004) (holding that district court did not abuse its discretion in overruling defendant's relevance objection to government witness). Fishburne was relevant to the case because one of the reasons for the adverse actions was that Donahue went outside the chain of command by having Fishburne removed from the contract. A:481–82; *see also* A:30 ("Your action was improper, as you were not the Contracting Officer's Technical Representative for that contract, and your actions in contacting the contractor, which resulted in Mr. Fishburne's removal from that tasking, were outside the scope of your authority."). As for Donahue's complaints regarding his testimony as to Donahue's performance, when Fishburne was asked a question on that topic, the District Court sustained the objection and informed the jury that Fishburne is "not a decision-maker here," and "[u]nless he communicated something to someone who's a decision-maker, his views on this aren't all that relevant." A:665–66. The District Court thus ably performed its task as the

---

[5]     Donahue has not urged on appeal that Fishburne's testimony should have been excluded under Federal Rule of Evidence 403. *See generally* Aplt. Br. The omission of a properly developed argument in her opening brief waives the issue. *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, 57 F.4th 1061, 1067 (D.C. Cir. 2023).

"bulwark[ ] of our justice system." *See Huthnance*, 722 F.3d at 379.  Because the District Court curtailed Fishburne's testimony, Donahue fails to show any prejudicial error.

Third, Curtin was made known to Donahue "during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  Curtin was mentioned during Donahue's deposition, in connection with a discussion of an email that was produced in discovery.  A:1164.  In arguing that the substance of Curtin's testimony was not made known to her during discovery, Aplt. Br. at 17–19, Donahue confuses the standard for supplementing initial disclosures—which excuses a party from being required to supplement its initial disclosures unless the witness has not "been made known to [her] during the discovery process or in writing," Fed. R. Civ. P. 26(e)(1)(A); *Kapche*, 677 F.3d at 468—with the requirements for pretrial disclosures, which require "summaries of [the] evidence" that a party intends to present at trial, Fed. R. Civ. P. 26(a)(3)(A)(iii).  The Secretary provided a thorough description of Curtin's future testimony as part of his pretrial disclosures.  A:254–55.

Further, Donahue waived her timeliness objection to Curtin's testimony.  A:718.  "Absent plain error, . . . a failure to object to the admission of evidence normally amounts to a waiver of the right to challenge its admission on appeal." *Anderson v. Grp. Hospitalization, Inc.*, 820 F.2d 465, 469–70 (D.C. Cir. 1987); *see also Lane v. District of Columbia*, 887 F.3d 480, 485 (D.C. Cir. 2018).  Donahue

conceded that the Secretary could call Curtin if Curtin's testimony was limited to certain issues. *See* A:718 ("We don't have a problem with her talking about how she conveyed the message to Josh Fishburne, because we think that's irrelevant. But if she starts getting into what she thought of Michelle Donahue, we would have a big problem with that."). The District Court thus allowed Curtin to testify on these narrow grounds. *Id.* Accordingly, Donahue—who does not and cannot allege plain error—has waived any objection to Curtin's testifying.

Lastly, Hoburg was made known to Donahue "during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Donahue Exhibit 31, which was introduced at trial and on which Hoburg was copied, was also Exhibit 31 to Donahue's summary judgment opposition. *See* Aplt. Br. at 13–14 ("On April 15, 2019, Donahue discussed Exhibits 30 and 31 in her opposition to summary judgment and attached both exhibits.") (citing A:1038–45). Donahue produced this document in discovery. Aplt. Br. at 13–14. Donahue made this email of "significance" to her case in chief, A:871, and it was equally of significance to her during the discovery process, *see* Aplt. Br. at 13 ("Donahue discussed Conrad's exhibits thirteen times in her 2018 interrogatory responses.") (citing A:1115–61). Not only was Hoburg copied on the email, but Conrad's email concluded by informing Holtermann that, "[i]f you have any questions as to what are acceptable grounds and procedures for disciplinary action regarding a FEMA employee, I recommend that you speak to our

36

OCC [Office of the Chief Counsel] employment law attorney, Leigh Hoburg, to provide you with appropriate advice," thus further highlighting Hoburg's connection to some of the events. A:1041.

After Donahue made this email a significant part of her case-in-chief and Donahue even identified Hoburg to the jury during Donahue's direct examination, SA:299, the District Court permitted the Secretary to call Hoburg and noted that "Ms. Hoburg is clearly cc'd on the email, and so there is some notice to the plaintiff that she's potentially a person with some knowledge about these events." A:871; *see also Kapche*, 677 F.3d at 468. Balancing the equities based on its knowledge of the record and the case as it was being received into evidence and argued by the parties, the District Court allowed Hoburg to testify exclusively "for a very, very limited purpose; and that is to comment about Plaintiff's Exhibit 31." A:867–68. The District Court noted that Donahue's counsel "will be given an opportunity to cross-examine Ms. Hoburg about this, so that minimizes the prejudice to her and her client." A:871. The District Court's carefully prescribed evidentiary ruling was not an abuse of discretion. *See, e.g.*, *Kapche*, 677 F.3d at 468; *Huthnance*, 722 F.3d at 379. Donahue makes no claim that her counsel was not afforded reasonable time to prepare for Hoburg's cross-examination.

Further, as with Curtin, Donahue subsequently waived her objection to Hoburg's testimony. A:860, A:867. Rather than object to Hoburg being called as a

rebuttal witness, Donahue's counsel stated that she "would like the opportunity to question [Hoburg]" and "if the agency wants to go in that direction, we — we would welcome the opportunity to cross-examine her." A:860. Instead of objecting to her testimony writ large, Donahue narrowly objected to Hoburg "testifying about anything related to" "the personnel actions or any of the events in the spring of 2010." A:867. Thus, Donahue cannot urge on appeal that Hoburg should have been excluded for untimeliness or any other reason when she confessed that she would "welcome" the opportunity to cross-examine her. A:860; *see also Anderson*, 820 F.2d at 469–70. Donahue failed to preserve any general objection, and she likewise fails to show that Hoburg's admitted testimony went beyond the scope of what Donahue "welcomed" and was so prejudicial that the trial would have come out in her favor had Hoburg's limited testimony been excluded. The ample other evidence of legitimate, non-retaliatory reasons for the challenged personnel actions was more than sufficient to support the jury's verdict in favor of the Secretary, and Donahue's brief does little, if anything, to attempt to show otherwise.

Accordingly, Donahue's exclusion argument fails several times over. As each of these four witnesses was made known to Donahue during the discovery process (and actually well beforehand when Donahue worked with these individuals), the Secretary had no duty to supplement his initial disclosures to identify them, and the fact that they may have discoverable information was not a surprise to Donahue by

the time the trial commenced years after discovery began.  *See, e.g.*, *Kapche*, 677 F.3d at 468; Fed. R. Civ. P. 26(e)(1)(A).

## B. Because Hoburg Was a Rebuttal Witness Used Solely for Impeachment, the Secretary Was Not Required to Identify Her in Discovery.

While Hoburg was in fact made known to Donahue during the discovery process and not a surprise, A:1040–41, the District Court's evidentiary ruling should also be affirmed because the Secretary had no obligation to disclose on his initial disclosures a witness used "solely for impeachment."  *See* Fed. R. Civ. P. 26(a)(1)(A)(i) (obviating the need to identify a witness on initial disclosures if "the use would be solely for impeachment").  The District Court has "broad discretion in determining whether to admit or exclude rebuttal evidence." *Alsabri v. Obama*, 684 F.3d 1298, 1307–08 (D.C. Cir. 2012) (quoting *United States v. Fench*, 470 F.2d 1234, 1239 (D.C. Cir. 1972)).

The Court has previously explained that there is a circuit split regarding the meaning of the phrase, "the use would be solely for impeachment."  *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1281–83 (D.C. Cir. 2015).  "[S]ome circuits, such as the Seventh Circuit . . . , reject the proposition that 'solely' means that the evidence can have no substantive non-impeachment value."  *Id.* at 1283 (citing *DeBlasio v. Ill. Cent. R.R.*, 52 F.3d 678, 686 (7th Cir. 1995)).  Other "courts have concluded that the impeachment exception is limited to evidence that has no

potential utility other than impeachment." *Id.* (citing *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517–18 (1st Cir. 1993)). This Court has not weighed in on the controversy. *See id.* at 1284 ("[W]e have no occasion to decide which of the competing approaches to the 'solely for impeachment' exception should be adopted in this circuit.").

This case once again does not require the Court to weigh in on the controversy. Donahue does not assert that the Secretary's counsel knew of Hoburg's relevance on February 26, 2018, when serving the Secretary's initial disclosures. A:51. To the contrary, she asserts merely that the Secretary was "aware of the exhibits [on which Hoburg's name appeared] at the latest by April 15, 2019," long after the initial disclosures were made and even longer before the trial. Aplt. Br. at 14. Donahue notes that it was she, not the Secretary, who produced Donahue Exhibits 30 and 31 in discovery, Aplt. Br. at 13, because Donahue had obtained these emails from Conrad unbeknownst to the Secretary, *see* A:1042 (Conrad forwarding Exhibit 31 to Donahue and telling her "do not forward or pass around"). Donahue cites her interrogatory responses, A:1160, which likewise postdated the Secretary's initial disclosures, A:51, as further evidence that the Secretary should have supplemented his initial disclosures, not that the Secretary would have known of Hoburg's relevance in February 2018. Aplt. Br. at 13. Parties have no duty to supplement

their initial disclosures for witnesses "made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Were the Court nonetheless inclined to wade into the circuit split here, it should apply the text of Rule 26(a)(1) as written. The text states that there is no obligation to identify witnesses in a party's initial disclosures whose "use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). The text speaks to the party's intended "use" of the witness, *id.*, not the more nebulous "potential utility" test adopted by the First Circuit. *Contra Chiasson*, 988 F.2d at 517–18.

Here, Hoburg's testimony was used solely for impeachment. On direct examination, Donahue testified that Conrad, a FEMA attorney, said that Donahue "had done nothing wrong; that Dr. Holtermann has no legitimate basis to discipline me; . . . and that if [Holtermann] attempts to discipline [her] for [her] actions involving the contractor, [she is] protected. [Conrad] said he would speak with [the] FEMA employment law attorney [i.e., Hoburg] . . . on how [Holtermann] was handling this . . . and suggest to [Hoburg] that it's not a situation where disciplinary action would be appropriate." SA:298–99. She testified that Conrad "copied Leigh Hoburg, who is another FEMA attorney." SA:299.

With the door opened by Donahue, the Secretary called Hoburg solely to impeach Donahue's testimony. A:1004–13. First, the Secretary asked standard, necessary background questions to orient the jury to the witness, including about

Hoburg's relationship to Donahue. A:1004–08. Second, the Secretary asked about whether Holtermann's disciplinary action against Donahue was consistent with the applicable FEMA personnel manual. A:1008–11. Hoburg thus rebutted Donahue's argument that multiple FEMA attorneys believed contemporaneously that Holtermann could not lawfully take disciplinary action against Donahue. *See* SA:298–99. Lastly, the Secretary asked whether there were multiple disciplinary actions against Donahue. A:1012–13. Donahue thereafter availed herself of the opportunity to cross-examine Hoburg, A:1013–14, and the Secretary then rested his case without conducting any redirect, thereby giving Donahue the final word, A:1014.

Donahue's argument on appeal that Hoburg's testimony went beyond impeachment by effectively corroborating the compelling evidence that the Secretary put forward in his case-in-chief misses the mark. The use of Hoburg's testimony was to impeach Donahue's representations that multiple FEMA attorneys believed Holtermann could not discipline her for her actions stemming from the Fishburne incident. *See* SA:298–99 (Donahue's testimony: "[FEMA attorney Conrad] told me that, just like I said before, that he couldn't be my personal attorney, but that I had done nothing wrong; that Dr. Holtermann has no legitimate basis to discipline me; and that I was a permanent, full-time employee; I have rights under the Merit Systems Protection Board; and that if [Holtermann] attempts to discipline

42

you for your actions involving the contractor [i.e., Fishburne], you are protected.  He said he would speak with [the] FEMA employment law attorney . . . on how [Holtermann] was handling this, to discipline me, and suggest to her [i.e., Hoburg] that it's not a situation where disciplinary action would be appropriate."); *see also* SA:299 (identifying "Hoburg, who is another attorney at FEMA," as being copied on Conrad's email).

Impeachment testimony almost always serves to corroborate one party's version of events, and a contrary ruling would improperly eviscerate Rule 26(a)(1)'s exception for impeachment evidence.  *See Standley*, 783 F.3d at 1283 ("[C]ourts reason that evidence used to attack a witness's credibility often contains some substantive element, and reading Rule 26(a)'s 'solely for impeachment' exception to bar use of such evidence if not earlier disclosed could 'result in an erosion of evidence capable of warranting the impeachment designation.'") (quoting *Hayes v. Cha*, 338 F. Supp. 2d 470, 503 (D.N.J. 2004)); *see also Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641, 649–50 (D. Or. 2000) ("It is the rare case where an attack on a witness's credibility cannot be linked to some substantive element of a claim.  Under [the First Circuit's approach], admission of evidence offered 'solely' to impeach would likely be erroneous in almost every case.  It is doubtful Congress intended the 'solely' exception to swallow the entire impeachment rule.").  Rule 26 speaks of the

43

intended "use" of evidence being solely for impeachment; it does not address any ancillary or secondary effects. Fed. R. Civ. P. 26(a)(1)(A)(i).

In any event, Donahue waived her objections to Hoburg's testimony by "welcom[ing] the opportunity to cross-examine her," A:860, and the Secretary had no duty to supplement his initial disclosures because Hoburg was made known to Donahue during the discovery process of in writing, *see* Fed. R. Civ. P. 26(e)(1)(A). Further, as described below, Hoburg's brief testimony is not claimed to have affected the outcome of the case, so Donahue has not identified a reversible error.

### C. Donahue Has Not Met Her Burden of Demonstrating That the District Court's Decision to Permit Dodwell, Fishburne, Curtin, or Hoburg to Testify Affected the Outcome of the Case.

Even if Donahue could demonstrate that the District Court's careful consideration of these evidentiary issues strayed well outside its broad discretion, the Court should affirm because Donahue has not satisfied her burden to show that Dodwell's, Fishburne's, Curtin's, or Hoburg's testimony, alone or in combination, affected the outcome of the case. *See Huthnance*, 722 F.3d at 381, 383. Donahue asserts the legal conclusion, without support, that "[b]ecause the outcome of the trial turned on the jury's assessment of the credibility of Donahue and the management officials, the substantive testimony of these undisclosed witnesses likely influenced the outcome of the trial." Aplt. Br. at 27.

This is not the standard. The inquiry is "whether the error substantially affected the outcome of the case." *Huthnance*, 722 F.3d at 381. The jury already had the testimony of several witnesses for Donahue who bolstered Donahue's credibility (e.g., Aucott, Strother, Ruffo, and Hokenstad). *See, e.g.*, SA:23 (Aucott testifying that Donahue "had a solid reputation as a senior Marine Corps officer, and I enjoyed working with her"); SA:67 (Strother testifying that Donahue had her "stuff together" because she "made it through Marine Corps [Officer Candidates School] and became a lieutenant colonel" and that, after a time, Strother "noticed a tone difference in the way [Holtermann] addressed [Donahue] versus other people"); SA:112 (Hokenstad testifying that Donahue was "vivacious and inclusive and I had no impression that anybody had a problem with her"). The jury also already heard the testimony of several witness who bolstered Holtermann's credibility and confirmed the Secretary's version of events, including Wyckoff, Siceloff, and Whitehead. *See supra*. The jury promptly returned a verdict for the Secretary. SA:20–21.

Dodwell, Fishburne, Curtin, and Hoburg were not the Secretary's key witnesses. Their direct examination encompasses only twelve, fifty-three, eleven, and nine pages, respectively, of the transcripts. A:592–604; A:645–98; A:740–51; A:1004–13. (In contrast, Holtermann's direct examination alone spans 134 pages. A:325–447; A:475–87.) These four witnesses were not front and center in either

party's closing statements, with Curtin not being mentioned at all.  A:1083–1111 (Secretary's); SA:524–41 (Donahue's).  The key testimony was that of Donahue and the decisionmakers, each of whom was disclosed in the Secretary's initial disclosures.  A:48–50.

Donahue also has not demonstrated that her ability to cross-examine the witnesses failed to mitigate the purported error.  *See United States v. Miller*, 738 F.3d 361, 372 (D.C. Cir. 2013) (holding that the government's vouching of a witness did not substantially prejudice defendants because the witness "was heavily impeached on cross-examination"); *United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017) (district court was not required to exclude evidence and any prejudice "easily could have been mitigated by thorough cross examination"); *United States v. Licavoli*, 604 F.2d 613, 623 (9th Cir. 1979) (finding no reversible error because "counsel was able to mitigate the prejudicial effect of the testimony through effective cross examination").  During trial, Donahue "welcome[d]" the opportunity to cross-examine the Secretary's witnesses, A:860 (Hoburg), and she availed herself of that opportunity for each of the witnesses at issue, A:604–06 (Dodwell); A:698–706 (Fishburne); A:751–55 (Curtin); A:1013–14 (Hoburg).  Donahue offers nothing but speculation to indicate that her cross-examination of these witnesses would have revealed more probative evidence if they had been listed on the Secretary's initial disclosures.  *See Lane*, 887 F.3d at 486 (rejecting argument that late disclosure of

evidence tainted the trial and had precluded plaintiff from taking depositions because "any additional questioning . . . was unlikely to lead to any probative evidence"). Accordingly, Donahue has not met her burden to demonstrate that any error substantially affected the outcome of the trial.

## II. THE DISTRICT COURT ACTED COMFORTABLY WITHIN ITS DISCRETION BY ALLOWING DONAHUE'S "ME TOO" WITNESSES TO TESTIFY WITH ORDINARY INSTRUCTIONS TO REFRAIN FROM SPECULATING ABOUT OTHER WITNESSES' STATE OF MIND.

Donahue's argument regarding the District Court's admission of her "me too" witnesses fails threefold: (1) it was waived; (2) it is premised on a mistaken understanding of the rule of lay opinion testimony; and (3) the narrow restriction did not substantially affect the outcome of trial.  First, Donahue acceded to the District Court's ruling limiting Ruffo's and Hokenstad's testimony and cannot now argue against that ruling on appeal.  A:302.  At no point did Donahue urge that the District Court was improperly excluding "lay opinion testimony" by preventing Ruffo and Hokenstad from testifying as to Holtermann's state of mind, and she cannot raise this argument for the first item on appeal.  *See Trout v. Sec'y of Navy*, 540 F.3d 442, 448 (D.C. Cir. 2008) ("[T]his argument was not raised during the proceedings before the district court, and we therefore deem it waived.").

Second, lay opinion testimony is not synonymous with speculative testimony about the state of mind of a decisionmaker whose intent is an issue for the jury to

decide. *See United States v. Heldt*, 668 F.2d 1238, 1284 (D.C. Cir. 1981) ("[A] witness can't testify to the fact of another's state of mind, barring a possible exception where the witness is a psychiatrist.") (quoting *United States v. McMichael*, 492 F. Supp. 205, 208 (D. Colo. 1980)).  Lay opinion must still be "based upon personal knowledge." *United States v. Williams* 827 F.3d 1134, 1156 (D.C. Cir. 2016).  When lay opinion is based upon hearsay or any other information not before the jury, it is properly excluded because otherwise the witness may "potentially 'usurp[ ] the jury's function' by presenting the conclusion that should be drawn from facts of which he, but not the jury, was fully aware." *Id.* at 1159 (quoting *United States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013)).  As the Second Circuit has explained, "[w]itnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but 'the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant' was motivated by an impermissible animus." *Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000) (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)); *accord Page v. Commandant, U.S. Disciplinary Barracks*, 844 F. App'x 78, 81 (10th Cir. 2021).  This is precisely the line the District Court correctly drew.  A:302.

Third, any error did not substantially affect the outcome of trial because, notwithstanding the District Court's oral ruling, the jury heard this very evidence from Ruffo and Hokenstad.  Even though Ruffo and Hokenstad were not supposed to speculate as to Holtermann's state of mind, they did precisely that.  *See, e.g.*, SA:218 (Ruffo testifying that Holtermann was "really retaliating against me.  And we [i.e., Donahue and Ruffo] talked about it, and it was because she filed an EEO complaint on my behalf."); SA:229–30 (Holtermann "slowly just retaliated" against Donahue."); SA:231–32 (Holtermann "retaliate[d]" against Ruffo.); SA:147–48 (Hokenstad believed she was "being retaliated against" "[f]or the support of the EEO complaint that was filed, that I was very publicly in support of [Donahue] and [Ruffo].").  Donahue is arguing against a pre-trial ruling that her witnesses effectively eviscerated at trial.  *See United States v. Robinson*, 439 F.3d 777, 781 (8th Cir. 2006) ("[T]here is no prejudice because the [party] introduced this information into evidence anyway.").  For each of these reasons, the Court should affirm.

## III.  THE COURT ACTED COMFORTABLY WITHIN ITS TRIAL MANAGEMENT DISCRETION BY NOT ALLOWING TWO INCONSEQUENTIAL WITNESSES WHO FACED NO NEWLY EMERGENT ISSUES TO TESTIFY REMOTELY BECAUSE DONAHUE BELATEDLY ASKED FOR PERMISSION.

For civil trials, the Rules require testimony to be "taken in open court," but provide an exception "[f]or good cause in compelling circumstances and with

appropriate safeguards."  Fed. R. Civ. P. 43(a).  Remote testimony has its perils, including, as happened with Ruffo, that a witness may improperly testify with the help of notes improperly placed outside the view of the camera, SA:210–11; SA:338, technical or logistical difficulties displaying an exhibit and the witness simultaneously, SA:341, and internet connectivity issues causing witnesses to freeze, SA:236–37.  These difficulties are in addition to the profound loss of the truth-inducing effect of having a witness physically present and taking the oath to tell the truth in the judge's and jury's presence in the courtroom.  *See United States v. Carver*, 907 F.3d 1199, 1207 (9th Cir. 2018) ("Any procedure that allows an adverse witness to testify remotely necessarily diminishes 'the profound [truth-inducing] effect upon a witness of *standing in the presence* of the person the witness accuses.'") (alteration and emphasis in original) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1020 (1988)); *see also Coy*, 487 U.S. at 1015–16 (describing the paramount importance and esteemed history of the right to a "face-to-face meeting with witnesses appearing before the trier of fact").

Sudden surprises may happen, however, and the Rules provide an escape hatch for good cause and compelling circumstances.  Fed. R. Civ. P. 43(a).  "The most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such as accident or illness, but remains able to testify from a different place."  Fed. R. Civ. P. 43

advisory committee's note to 1996 amendment; *accord Palmer v. Valdez*, 560 F.3d 965, 969 n.4 (9th Cir. 2009); *Eller v. Trans Union, LLC*, 739 F.3d 467, 478 (10th Cir. 2013) ("As the Advisory Committee Notes to Rule 43(a) explain, the rule is intended to permit remote testimony when a witness's inability to attend trial is the result of 'unexpected reasons, such as accident or illness,' and not when it is merely 'inconvenient for the witness to attend the trial.'") (quoting Fed. R. Civ. P. 43 advisory committee's note to 1996 amendment).

The District Court did not abuse its discretion here by disallowing remote testimony requested at the eve of trial. *See, e.g.*, *Eller*, 739 F.3d 467, 478–79 (10th Cir. 2013) ("Eller cites no case in which an appellate court has held that a trial court abused its discretion by *not* allowing remote testimony," and holding that district court did not abuse its discretion in that case) (emphasis in original); *United States v. Kivanc*, 714 F.3d 782, 791 (4th Cir. 2013) (no abuse of discretion in refusing to allow witness to testify remotely); *Palmer*, 560 F.3d at 969 ("[I]t was within the district court's discretion to deny the motion [for remote testimony] and we find that the court did not abuse its discretion in doing so."). Like in *Eller*, Donahue "knew well in advance of trial" that her witnesses would need to testify remotely, and she "could have made arrangements ahead of time for introducing [their] testimony, by deposition for instance." 739 F.3d at 478. The COVID pandemic had been simmering for more than a year and a half by that point, and Dyer and Goertz were

Donahue's close friends.  *Supra* at 12–13; *see also Ali v. Lambert*, No. 20-5084, 2021 WL 3009712, at *3 (10th Cir. 2021) (rejecting argument that "COVID-19 restrictions created compelling circumstances, so the 'district court could have' allowed him to appear at trial through videoconferencing" and holding that district court did not abuse its discretion in denying request to testify remotely).  As the District Court explained, "the circumstances both witnesses describe do not appear to be emergent," and Donahue should have raised this issue much earlier than two days before the commencement of trial, especially considering the extensive pretrial proceedings the District Court conducted.  A:279.  Accordingly, the District Court acted comfortably within its discretion.

Further, Donahue fails to demonstrate that any perceived error "substantially affected the outcome of the case."  *Huthnance*, 722 F.3d at 381.  As Donahue repeatedly acknowledges, Dyer and Goertz were "damages witnesses."  Aplt. Br. at 6, 30.  The jury did not reach the question of damages because it found that Donahue had not proven by a preponderance of the evidence that Donahue suffered retaliation or a retaliatory hostile work environment.  SA:20–21.  *Quod erat demonstrandum*, the exclusion of damages witnesses could not have affected the outcome of the trial.  *See Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 327 F.3d 771, 779 n.4 (8th Cir. 2003) ("We note that Dr. Taborn was excluded as an expert *damages* witness.  The jury only reached the issue of damages for Appellant

Webb. Thus, only Appellant Webb can claim the alleged adverse effects of the district court's evidentiary ruling regarding Dr. Taborn.") (emphasis in original); *Peterson v. Willie*, 81 F.3d 1033, 1038 (11th Cir. 1996) (holding that, although the district court erred in allowing certain testimony from a witness, Dr. Lichtblau, the error was harmless because "Dr. Lichtblau was essentially a damage witness" and the jury found that defendants "were not liable for [plaintiff's] injuries").

Even had the jury reached the question of damages, which it did not, Donahue offers nothing but speculation to indicate that the exclusion of two more damages witnesses would have substantially affected any award of damages. Donahue simply urges that, "[u]nlike Donahue's other two damages witnesses, Goertz and Dyer were not related to her." Aplt. Br. at 30. First, Donahue's two adult daughters were not her only damages witnesses. Donahue also called Dr. Chapman, her psychiatrist, to testify as to damages. SA:449, SA:454–56. Additionally, Donahue had another friend, Hokenstad, testify as to her declining mental health after the incidents at issue. SA:151–52. Calling two more friends to testify as to Donahue's declining mental health would not have substantially affected the outcome when the jury had already heard about this from Donahue's psychiatrist and another of Donahue's close friends. *See also* Fed. R. Evid. 403 (evidence whose probative value is substantially outweighed by its cumulative effect or is a waste of juror time may be excluded).

Based on this record, the decision not to allow Dyer's and Goertz to testify remotely did not substantially affect the outcome of the trial. The District Court ably performed its duties "at the bulwarks of our justice system," *Huthnance*, 722 F.3d at 379, and acted comfortably within its discretion.

## **CONCLUSION**

Appellee respectfully requests that the Court affirm.

MATTHEW M. GRAVES
United States Attorney

BRIAN P. HUDAK
JANE M. LYONS
Assistant United States Attorneys

*/s/ Douglas C. Dreier*
DOUGLAS C. DREIER
JOHN MOUSTAKAS
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-2551
douglas.dreier@usdoj.gov

54

## CERTIFICATE OF SERVICE

I hereby certify on this 23rd day of May, 2023, the foregoing Brief has been served by the Court's CM/ECF system.

/s/ Douglas C. Dreier
DOUGLAS C. DREIER
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,429 words, excluding the parts of the brief exempted under Rule 32(f) and D.C. Cir. Rule 32(e), according to the count of Microsoft Word.

/s/ Douglas C. Dreier
DOUGLAS C. DREIER
Assistant United States Attorney

**ADDENDUM**

**Fed. R. Civ. P. 26(a)(1)(A), (a)(1)(C)–(E), (a)(3), (e)(1):**

(a) Required Disclosures.

(1) Initial Disclosure.

(A) In General. Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

(iii) a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

. . . .

(C) Time for Initial Disclosures—In General. A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order, or unless a party objects during the conference that initial disclosures are not appropriate in this action and states the objection in the proposed discovery plan. In ruling on the objection, the court must determine what disclosures, if any, are to be made and must set the time for disclosure.

(D) Time for Initial Disclosures—For Parties Served or Joined Later. A party that is first served or otherwise joined after the Rule 26(f) conference must make the initial disclosures within 30 days after being served or joined, unless a different time is set by stipulation or court order.

(E) Basis for Initial Disclosure; Unacceptable Excuses. A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

. . . .

(3) Pretrial Disclosures.

(A) In General. In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment:

(i) the name and, if not previously provided, the address and telephone number of each witness—separately identifying those the party expects to present and those it may call if the need arises;

(ii) the designation of those witnesses whose testimony the party expects to present by deposition and, if not taken stenographically, a transcript of the pertinent parts of the deposition; and

(iii) an identification of each document or other exhibit, including summaries of other evidence—separately identifying those items the party expects to offer and those it may offer if the need arises.

(B) Time for Pretrial Disclosures; Objections. Unless the court orders otherwise, these disclosures must be made at least 30 days before trial. Within 14 days after they are made, unless the court sets a different time, a party may serve and promptly file a list of the following objections: any objections to the use under Rule 32(a) of a deposition designated by another party under Rule 26(a)(3)(A)(ii); and any objection, together with the grounds for it, that may be made to the admissibility of materials identified under Rule 26(a)(3)(A)(iii). An objection not so made—except for one under Federal Rule of Evidence 402 or 403—is waived unless excused by the court for good cause.

. . . .

(e) Supplementing Disclosures and Responses.

(1) In General. A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

(A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or

(B) as ordered by the court.

## Fed. R. Civ. P. 37(c)(1):

(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.

(1) Failure to Disclose or Supplement.  If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

## Fed. R. Civ. P. 43(a):

(a) In Open Court. At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise.  For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location.

**Fed. R. Evid. 701:**

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.